ORAL ARGUMENT NOT SCHEDULED

NO. 16-1420

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN RAILCAR INDUSTRIES, INC., Petitioner,

v.

FEDERAL RAILROAD ADMINISTRATION, *et al.*, Respondents.

On Petition for Review of
Railworthiness Directive No. 2016-01
Issued by the Federal Railroad Administration

## Reply Brief of Petitioner American Railcar Industries, Inc.

Barry M. Hartman
Pamela J. Garvie
Theodore L. Kornobis
Sarah M. Beason
Curtis S. Kowalk
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C. 20006-1600

Sandra L. Brown
Thompson Hine LLP
1919 M Street NW, Suite 700
Washington, DC 20036-3537

*Attorneys for Petitioner American
Railcar Industries, Inc.*

# TABLE OF CONTENTS

GLOSSARY ................................................................................................ vii

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT .............................................................................................. 3

I.   FRA Has Misapplied the Principles Governing When It Must Follow
     Notice-and-Comment Rulemaking ................................................... 3

     A.   An Informal Adjudication May Not Impose Obligations that
          Contradict Existing Regulations ............................................ 3

          1.   The Directive Imposes Requirements that Contradict
               and Effectively Amend the Regulations ................................... 4

          2.   The Directive's Broad Scope and Impact Demonstrate
               Why Rulemaking is Required .................................................... 5

     B.   FRA Fails to Acknowledge the Heightened Rulemaking
          Requirements in the Act ....................................................... 7

     C.   FRA's Illegal Actions Prejudiced ARI ............................... 8

II.  The Directive Is Arbitrary, Capricious, and Inconsistent with Law ........... 11

     A.   FRA Has Not Identified Any Record Evidence Supporting Its
          Asserted Causal Connection between Weld Defects Found in
          Other Tank Cars of the Same Class and the Possibility of a
          Leak ................................................................................. 11

          1.   The Record Does Not Support FRA's Assumption that a
               Weld Defect Grew to Allow a Leak on CTCX-736177 ......... 12

          2.   FRA Assumes With No Evidence, that All Weld
               Defects Are the "Same" ........................................................... 13

          3.   No Evidence Supports FRA's Conclusion that Leaks
               Might Develop from the Weld Defects Found on the
               Sampled Cars ........................................................................ 14

4.    The Record Does Not Support the Need for a Directive
as to the Entire Class of Cars .................................................. 18

B.    The Regulation Permits FRA to Order More Frequent Tests,
Not to Alter the Testing Requirements .............................. 19

C.    The Directive's Requirements Are Arbitrary and Capricious .......... 22

1.    The Record Contains No Justification to Support FRA
Imposing the 90% POD Requirement .................................... 22

2.    There Is No Record Support for the New
Recordkeeping and Reporting Requirements ......................... 26

CONCLUSION ................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Coke & Coal Chems. Inst. v. EPA,*
 452 F.3d 930 (D.C. Cir. 2006)................................................................8

*\*Am. Fed'n of Gov't Emps., AFL-CIO Local 3090 v. Fed. Labor
 Relations Auth.,*
 777 F.2d 751 (D.C. Cir. 1985)...............................................................4

*\*Am. Mining Cong. v. EPA,*
 907 F.2d 1179 (D.C. Cir. 1990)....................................................15, 16

*Barnhart v. Walton,*
 535 U.S. 212 (2002)..............................................................................21

*Burlington Truck Lines, Inc. v. United States,*
 371 U.S. 156 (1962)........................................................................16, 24

*Chem. Mfrs. Ass'n v. EPA,*
 870 F.2d 177 (5th Cir. 1989)...................................................................8

*Christensen v. Harris Cnty.,*
 529 U.S. 576 (2000)..........................................................................5, 19

*City of Arlington v. FCC,*
 668 F.3d 229 (5th Cir. 2012), *aff'd*, 133 S. Ct. 1863 (2013)................3

*Covad Commc'ns Co. v. FCC,*
 450 F.3d 528 (D.C. Cir. 2006)..............................................................16

*Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision,*
 139 F.3d 203 (D.C. Cir. 1998)................................................................8

*Dunn v. CFTC,*
 519 U.S. 465 (1997)..............................................................................19

*\*Emera Maine v. FERC,*
 No. 15-1118, 2017 WL 1364988 (D.C. Cir. Apr. 14, 2017) ........12, 27

*Everett v. United States*,
    158 F.3d 1364 (D.C. Cir. 1998) ............................................................5

*Fox v. Clinton*,
    684 F.3d 67 (D.C. Cir. 2012) ..............................................................11

*Gen. Am. Transp. Corp. v. Interstate Commerce Comm'n*,
    883 F.2d 1029 (D.C. Cir. 1989) ............................................................5

*Hercules, Inc. v. EPA*,
    598 F.2d 91 (D.C. Cir. 1978)............................................................5, 6

*Huls Am. Inc. v. Browner*,
    83 F.3d 445 (D.C. Cir. 1996) ..............................................................26

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) ............................................................8

*Leather Indus. of Am., Inc. v. EPA*,
    40 F.3d 392 (D.C. Cir. 1994) ..............................................................16

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ............................................................7

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................11, 18

*Reytblatt v. NRC*,
    105 F.3d 715 (D.C. Cir. 1997) ............................................................16

*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007) ..............................................................5

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ........................................................................3, 7

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................8

*Tunik v. Merit Sys. Prot. Bd.*,
    407 F.3d 1326 (Fed. Cir. 2005) ............................................................4

*U.S. Postal Serv. v. Postal Regulatory Comm'n,
    842 F.3d 1271 (D.C. Cir. 2016) ....................................................17, 23

Yesler Terrace Cmty. Council v. Cisneros,
    37 F.3d 442 (9th Cir. 1994) ...........................................................6

**Statutes**

49 U.S.C. § 5103(b) ...........................................................................7

49 U.S.C. § 5121(a) ...........................................................................8

49 U.S.C. § 5121(c)(1)(E) ..................................................................8

49 U.S.C. § 5121(d)(1) .......................................................................8

**Regulations**

49 C.F.R. § 109.3 .............................................................................21

49 C.F.R. § 109.9 ...............................................................................8

49 C.F.R. § 109.17 ..............................................................................8

*49 C.F.R. § 180.503 ...................................................................12, 20

49 C.F.R. § 180.509 ....................................................................12, 21

49 C.F.R. § 180.509(b) .....................................................................19

*49 C.F.R. § 180.509(b)(4)........................... 3, 8, 15, 16, 18, 19, 20

49 C.F.R. § 180.513 ..........................................................................21

58 Fed. Reg. 48,485 (Sept. 16, 1993) ...............................................25

61 Fed. Reg. 33,250 (June 26, 1996) ................................................20

64 Fed. Reg. 18,473 (Apr. 14, 1999) ................................................21

80 Fed. Reg. 14,027 (Mar. 18, 2015)...........................................20, 21

**Other Authorities**

Lockheed Georgia Co., "Reliability of Nondestructive Inspections" at
    xi (1978), http://www.dtic.mil/dtic/tr/fulltext/u2/a072097.pdf ..........................25

# GLOSSARY

| Abbreviation | Term |
|---|---|
| AAR | Association of American Railroads |
| APA | Administrative Procedure Act |
| CTCX-736177 | The tank car that was found to have leaked one gallon of ethanol in May 2014 |
| FRA | Federal Railroad Administration |
| POD | Probability of Detection |

**SUMMARY OF ARGUMENT**

The Federal Railroad Administration and other Respondents (collectively, "FRA") advance two main arguments in response to ARI's opening brief. First, that Railworthiness Directive 2016-01 (the "Directive") results from an informal adjudication, and thus FRA was not required to adhere to the Administrative Procedure Act's ("APA") rulemaking process. Second, that the Directive is sufficiently supported by the record and is therefore not arbitrary and capricious. Neither argument is persuasive.

FRA admits that the Directive imposes new substantive testing and inspection requirements that go beyond and contradict the agency's current regulations. Agencies cannot amend regulations through adjudications and must utilize the notice-and-comment process. FRA ignores that the Hazardous Materials Transportation Act ("Act") imposes a heightened requirement that FRA must implement such requirements via notice-and-comment rulemaking. Finally, while FRA incorrectly frames the Directive narrowly in order to imbue it with the hallmarks of an appropriate adjudicative order, in reality the Directive resembles a rule due to its immediate, broad, prospective impact on actors across the rail industry and its open-ended future impacts.

FRA's defense of its basis for issuing the Directive's substance fails to meet its own requirement that it have an "objectively reasonable and articulable belief"

1

based on "particularized and identifiable" facts that a tank car or a class or design of tank cars may be in an unsafe operating condition. FRA does not deny that this case is about a one gallon leak of ethanol from one rail car over two years ago. It points to no evidence that any other car in the class has leaked or has the condition that allowed that one leak to occur. It states that sampling of hundreds of other cars revealed weld defects and asserts that such cars might leak, but does not address the undisputed evidence that such conditions will not develop a leak. In short, there is no fact that demonstrates a causal connection between the one gallon leak on one car, the assumptions made about cars of the same class, and the requirements being imposed on up to 12,000 other tank cars that will cost millions of dollars to meet. In fact, all of the record evidence demonstrates the opposite. FRA's entire defense is to ask this Court to defer to its technical expertise, but it provides no particularized facts to support the foundation on which its "expert" decisions were rendered.

FRA's defense of the substance of the Directive is equally unavailing. While not denying it has created a new test requirement not in regulations (the 90% probability of detection ("POD") requirement), it turns to new, extra record evidence relating to testing space vehicles, and even those do not support this new requirement. Its defense of the new recordkeeping requirements is even thinner: it simply disagrees with no discussion.

The Directive should therefore be vacated.

## ARGUMENT

### I. FRA Has Misapplied the Principles Governing When It Must Follow Notice-and-Comment Rulemaking

#### A. An Informal Adjudication May Not Impose Obligations that Contradict Existing Regulations

FRA's characterization of the Directive as an informal adjudication, requiring additional inspection and testing of "one specific tank car design, manufactured by petitioner and just one other company," Resp. Br. 22, obscures the plain language and scope of the Directive, and overlooks the specific ways it establishes new substantive standards that contradict pre-existing regulations. Pet. Br. 24-31.

Agencies' general discretion to act via rulemaking or adjudication, *SEC v. Chenery Corp.*, 332 U.S. 194, 201-03 (1947), does not permit characterizing clear rulemaking activity as informal adjudication to avoid notice-and-comment procedures. *See City of Arlington v. FCC*, 668 F.3d 229, 241 (5th Cir. 2012) (absolute deference to an agency's characterization of its own actions would allow an agency to "escape the APA's notice-and-comment requirements simply by labeling a rulemaking an adjudication"), *aff'd*, 133 S. Ct. 1863 (2013).

Contrary to FRA's claims, Resp. Br. 17-19, ARI is not arguing that FRA must undertake notice-and-comment rulemaking to address any railroad safety issue or order tests under 49 C.F.R. § 180.509(b)(4). The problem is that this

Directive imposes new and unprecedented substantive testing requirements on the tank car industry that fundamentally contradict and rewrite the existing regulatory scheme. *See* Pet. Br. 26-35.

1. **The Directive Imposes Requirements that Contradict and Effectively Amend the Regulations**

The Directive's requirements cannot be imposed via an informal adjudication because they contradict and effectively amend existing regulations. *See Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326, 1341-42, 1345-46 (Fed. Cir. 2005) (agency cannot, by adjudication, overturn a regulation); *Am. Fed'n of Gov't Emps., AFL-CIO Local 3090 v. Fed. Labor Relations Auth.*, 777 F.2d 751, 759 (D.C. Cir. 1985) (agency seeking to modify regulation must use notice-and-comment).

The Directive changes and contradicts existing regulations in three ways, none of which FRA specifically addresses. *See* Pet. Br. 27-28. Most importantly, it creates and imposes on tank car owners a new 90% POD standard that FRA acknowledges (Resp. Br. 42-43) is found nowhere in its regulations. Pet. Br. 27, 30-31, 50-55. FRA does not address, much less dispute, the fundamental principle embodied in the tank car regulatory scheme that railcar testing methods (including whether and how to use a POD) are established by the car owner, consistent with the regulations and Association of American Railroads ("AAR") standards. *See* Section II.B, *infra*; Pet. Br. 4, 48-49. There is no reasonable interpretation of these

regulations that would allow the FRA to make those decisions for the owner. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).

The regulations neither create nor mandate a POD methodology for testing and inspections. If an owner believes it appropriate in some instances to use a POD methodology, that owner creates the POD for the specific circumstance, has it validated, and uses it. Pet. Br. 6-7. The Directive completely eradicates that process, mandating that tank car owners utilize an FRA-created 90% POD with a specific flaw size. FRA cannot effectively amend the rules this way via an adjudication.[1]

### 2. The Directive's Broad Scope and Impact Demonstrate Why Rulemaking is Required

ARI explained in detail how the Directive's requirements constitute legislative rules. Pet. Br. 25-31. FRA's brief seems to argue that the Directive's requirements could not be "rules" because the Directive is of limited scope and applicability. *See* Resp. Br. 19-22. Even if FRA is correct (which it is not), "rules" can apply to limited parties or circumstances. *See, e.g., Hercules, Inc. v.*

---

[1] None of the cases FRA cites involved a situation where the adjudication contradicted or effectively amended existing regulations. Resp. Br. 20. *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007) (advisory circulars did not contradict or go beyond pre-existing regulations); *Everett v. United States*, 158 F.3d 1364 (D.C. Cir. 1998) (order denying helicopter landing permit was consistent with existing regulations); *Gen. Am. Transp. Corp. v. Interstate Commerce Comm'n*, 883 F.2d 1029 (D.C. Cir. 1989) (agency could use adjudication to reverse tariffs policy that was developed in prior adjudication), *denying rehearing of* 872 F.2d 1048.

*EPA*, 598 F.2d 91, 118 (D.C. Cir. 1978) (rulemaking applying to single manufacturer).

More importantly, the Directive's effects are in fact much more widespread than FRA implies: it imposes direct and immediate obligations on all owners of up to 14,800 tank cars, as well as repair facilities and technicians. *See* Pet. Br. 3, 12-13, 20, 31-32. One industry member also referenced "cascading ramifications" across the industry. JA1811. As ARI noted, this includes increased traffic at repair facilities (which are already at capacity). JA1730-JA1731. *Cf. Hercules*, 598 F.2d at 118 (noting that "even when only one manufacturer is subject to [discharge] standards, that manufacturer is not the only affected entity" because "[t]he standards affect the multitude who fish, take drinking water, or otherwise, directly or indirectly, come in contact with waters").

Also, the Directive imposes immediate and direct requirements on persons beyond the parties to the controversy. This differs from ordinary adjudications, which impact persons not before the agency because of the adjudication's precedential value, not from direct commands in the order itself. *Yesler Terrace Cmty. Council v. Cisneros,* 37 F.3d 442, 448 (9th Cir. 1994) (adjudications resolve disputes among specific individuals in specific cases, rulemaking affects rights of broader classes).

**B.     FRA Fails to Acknowledge the Heightened Rulemaking Requirements in the Act**

Although *Chenery* supports that an agency "would typically be entitled to deference" in choosing between rulemaking and adjudication, "when Congress has spoken, [the Court] is bound by that pronouncement." *Michigan v. EPA*, 268 F.3d 1075, 1087-88 (D.C. Cir. 2001) (citation omitted).  Thus, when Congress had "explicitly required use of notice and comment," the agency's "decision to use separate adjudicatory proceedings that [did] not include notice and comment [was] contrary to law and [did] not survive either *Chevron* step one or APA review." *Id.* at 1088 (although rulemaking may be "complex and difficult," the agency is bound by the statutory pronouncement).

The Act is similar. It specifically imposes notice-and-comment rulemaking obligations when the Secretary is "prescrib[ing] regulations for the safe transportation . . . of hazardous material."  49 U.S.C. § 5103(b).  *See* Pet. Br. 32-33.  That is exactly what the Directive does by setting a new standard for conducting safety tests and new recordkeeping requirements not in current regulations promulgated under the same statutory provision.

FRA's general references to other provisions of the Act giving the Secretary certain authorities do not alter its obligations here.  Resp. Br. 5-6, 26-27.  None were invoked by FRA to support the Directive nor do any give the Secretary authority to establish new substantive standards implementing the Act without

following notice-and-comment requirements.[2]  Further, the regulation that was relied on by FRA, § 180.509(b)(4), cannot permit FRA to circumvent the statute. *See* Pet. Br. 34; Section II.B, *infra*.

## C.    FRA's Illegal Actions Prejudiced ARI

Contrary to FRA's contention, Resp. Br. 27-29, an utter failure to comply with notice-and-comment requirements cannot be excused as harmless error, as that would "virtually repeal section 553's requirements."  *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (government cannot "skip those procedures, engage in informal consultation, and then be protected from judicial review"); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (demonstrating non-harmless error is "not… particularly onerous" (citation omitted)).[3]

---

[2]    *See* 49 U.S.C. § 5121(a) (various investigative tools); § 5121(d)(1) (emergency orders); § 5121(c)(1)(E) (authority for a transportation agent to order a "package" to be "transported to, opened, and the contents examined and analyzed, at a facility"); *see also* 49 C.F.R. § 109.9 (implementing 49 U.S.C. § 5121(c)(1)(E)), § 109.17 (implementing emergency order provision).  JA0001, JA0011,JA0020-JA0021.

[3]    The failure to follow rulemaking procedures thus distinguishes this case from those cited in FRA's brief, which involved technical mistakes during an adjudication, *Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203 (D.C. Cir. 1998), or a rulemaking, *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 940-41 (D.C. Cir. 2006); *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 202 (5th Cir. 1989).

The limited informal communication between FRA and ARI is no substitute for the structured APA process. FRA asserts that no prejudice exists because, in its judgment, the same outcome would result. Resp. Br. 27-28. That is far from certain. FRA's complete failure to follow the notice-and-comment process prevented ARI and others from learning in advance FRA's planned action and providing feedback. FRA would have had to establish a docket, consider and meaningfully respond to comments submitted, and explain its course of action.

In the two years preceding the original Directive, ARI's communications with FRA were informal and primarily through a single FRA employee. The agency then released a severely flawed original Directive. For example, it never occurred to FRA to consider or ask whether there were enough inspection slots in the country to inspect almost 14,800 tank cars within 12 months (there were not) before it imposed that requirement. JA1730-JA1731. Pet. Br. 13-14. The original Directive also demanded a 90% POD standard without specifying a flaw size—a crucial piece of information. *See* Section II.C, *infra;* Pet. Br. 14; JA0006-JA0007,JA1731-JA1732.

The communications between the issuance of the original and revised Directives were severely limited. The record reflects that FRA's informal "process" only allowed for communications from ARI and one other industry actor, out of the large number of impacted owners, technicians, facilities,

customers, and industry organizations. JA1709-JA1710,JA1729-JA1738,JA1808-JA1810,JA1811. FRA permitted (after repeated requests) a single meeting to discuss ARI's concerns, after which FRA did not provide any feedback on ARI's recommendations and refused to share any revisions it was considering before it issued them. Pet. Br. 15-16; JA1709,JA1729-JA1738,JA1800-JA1805,JA1808-JA1810,JA1844. This resulted in several significant flaws in the revised Directive (effective immediately), as identified here and in ARI's opening brief. *See* Pet. Br. 16-19; *infra* Section II.C. Contrary to FRA's statement, Resp. Br. 29, the revised Directive presented several new issues that ARI had not had a chance to address with FRA. For example, there was no opportunity for ARI or other industry participants to explain to FRA that its 90% POD approach was scientifically unsound or that selecting the highest-mileage railcars for its 15% sample was illogical and would not have included the only car to have leaked. Pet. Br. 18. Further, the Directive ignored ARI's evidence and analysis demonstrating that flaws like the one in the car that leaked one gallon of ethanol would not grow into cracks or would leak, and never explained whether and how it considered ARI's proposals that it would be sufficient to test the cars at their next "shopping event" (which could be more frequent than an inspection interval, such as at reassignments or bad orders) and use currently accepted testing methodologies. Pet. Br. 10, 20; JA0011-JA0027,JA1715-JA1718,JA1808-JA1810,JA1826.

## II. The Directive Is Arbitrary, Capricious, and Inconsistent with Law

### A. FRA Has Not Identified Any Record Evidence Supporting Its Asserted Causal Connection between Weld Defects Found in Other Tank Cars of the Same Class and the Possibility of a Leak

FRA's brief repeats the Directive's conclusion that the class of tank cars may be in an unsafe operating condition, but never points to facts in the record that demonstrate a causal relationship between the one-gallon leak in CTCX-736177, JA0250-JA0251, its cause, and the conditions found in the class of cars subject to the Directive. Indeed, there are none. Rather than address this, FRA's brief confuses and conflates this issue in a seeming attempt to mask the lack of data or analysis connecting the condition found (the identified weld flaws) with the ultimate risk (the possibility of a leak). Resp. Br. 30-32. Even when a court gives an agency deference on technical matters, the agency still must supply a reasoned explanation based on the record. *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012). A simple "Because I said so, and I'm the expert," will not suffice. Because FRA did not "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quotation omitted), the Directive is arbitrary and capricious.

FRA asserts that weld defects found on CTCX-736177 led to a crack, which led to a leak; that the "same defects" were found in 11-17% of the 700 sampled

cars; and that those defects may lead to leaks on other cars, rendering them potentially operationally unsafe. Resp. Br. 30-31. To reach this ultimate conclusion, FRA must demonstrate its "objectively reasonable and articulable belief," based on "particularized and identifiable facts," 49 C.F.R. §§ 180.503, 180.509, contained in the record that establish each of the following linkages:

> (1) a weld defect on CTCX-736177 grew to develop a one gallon leak;
>
> (2) 11-17% of the sampled cars have the "same defects";
>
> (3) those defects may result in a leak; and
>
> (4) novel expedited testing across an entire class of tank cars is necessary to identify these defects.

FRA's brief points to no facts (particularized or otherwise) in the record that meet these elements. *See Emera Maine v. FERC*, No. 15-1118, 2017 WL 1364988, at *10 (D.C. Cir. Apr. 14, 2017) (finding an agency's "bare conclusion" that something was "unjust and unreasonable," without further explanation, amounted to "nothing more than 'a talismanic phrase that does not advance reasoned decision making'" and was not entitled to deference (citation omitted)).

### 1. The Record Does Not Support FRA's Assumption that a Weld Defect Grew to Allow a Leak on CTCX-736177

FRA asserts that the one gallon leak in the CTCX-736177 car was caused by a weld defect that led to a crack that led to a leak, Resp. Br. 30, but points to

nothing in the record to support that conclusion. Instead, ultrasonic testing demonstrated that the leak was caused by a lack of fusion, *i.e.*, that the weld was never fully joined to the metal—a condition that would have existed from when the tank car was manufactured. *See* Pet. Br. 8. JA0557-JA0558,JA0564,JA0566,JA570,JA1815-JA1816,JA1819.[4]

FRA now claims that its conclusion that the leak developed over time is based on "an analysis" that FRA performed of testing done by CIT. Resp. Br. 9. Yet FRA cites to no such "analysis," in the record (and there is none). What is in the record is the CIT report that contains no conclusion—let alone particularized facts—that a defect led to a crack that led to the leak. JA0556-JA0568.

### 2. FRA Assumes With No Evidence, that All Weld Defects Are the "Same"

FRA's next unsupported link in the causal chain is that the weld defects found on a percentage of sampled cars are the "same defects" that were found on CTCX-736177. Resp. Br. 31. Again FRA points to nothing in the record to support this conclusion, and the record demonstrates that it is not true. *See* Pet. Br. 38-43.

---

[4] Because further FRA-supervised testing destroyed the weld condition, further specific analysis of the cause could not be undertaken. As explained below, the analysis that was undertaken assumed a weld defect was a crack and concluded the condition would not result in a leak. *See* Section II.A.3, *infra*.

The CTCX-736177 car had a weld defect (believed to be a 17" lack of fusion) related to the leak.  JA0556-JA0557,JA0570.  Testing also revealed *other* weld defects on that car—***none*** of which were leaking or showed any signs of cracking.  JA0544.  This latter group (*i.e.*, the non-leaking weld defects) are similar in size and type to those found on the 700 sampled cars.  JA0544-JA0545,JA1700-JA1701,JA1702-JA1703,JA1715-JA1718.  The record shows that ***none*** of the 700 sampled cars were found with anything like the weld defect that was found leaking on CTCX-736177, nor were any found leaking.  Pet. Br. 16-17, 39; JA1701-JA1702,JA1718.  This leads to the statistical conclusion that there is a 1-in-10,000 chance that any other tank car has any cracks or leaks.   Pet. Br. 15; JA1715,JA1717.  FRA has been unable to cite any record evidence to support its conclusion that the defect related to the leak is the "same" as any found in the sampled cars.

### 3. No Evidence Supports FRA's Conclusion that Leaks Might Develop from the Weld Defects Found on the Sampled Cars

FRA contends (again without support) that "[o]ver time, and subject to the stresses of the cars' use, [the weld] defects can cause the flawed welds to crack and result in leaks."  Resp. Br. 34; JA0003-JA0004.  FRA repeats this conclusion nearly a dozen times, including with references to some unspecified FRA "expert technical analysis," *see, e.g.*, Resp. Br. 37, citing only the Directive (which in turn cites nothing establishing a causal connection between the defects found in the

sampled cars and a leak).  *See, e.g.*, Resp. Br. 1, 9, 13, 14-15, 23-24, 31-32, 34, 37;

*see also* JA0015.  The record is devoid of any such FRA analysis, or anything to

support FRA's conclusions.  FRA's failure to provide any record-based

explanation relating the facts found (some weld defects in sampled cars) with its

conclusion (the defects present an operational risk requiring action) is fatal.  *See*

*Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1190-91 (D.C. Cir. 1990).  FRA cannot

issue a Directive solely on unsubstantiated bases.

In fact, all of the record evidence directly contradicts FRA's unsupported

assertion.  ARI presented an expert damage tolerance analysis that modeled the

largest non-leaking weld defect found on CTCX-736177 and concluded that such a

flaw, even conservatively assuming it to be a crack as FRA believes, ***will not*** result

in a leak over the course of the car's lifetime because of the relatively low stress

placed on the subject welds.  JA1715-JA1718,JA1826.  *See* Pet. Br. 10-11, 39, 43-

44.  FRA cannot invoke its § 180.509(b)(4) authority by just saying without any

facts that something might happen, when the evidence shows that it will not

happen.

FRA concedes its failure to acknowledge or respond to this analysis in the

Directive, arguing that it did not consider it "especially relevant."  Resp. Br. 36.

This is difficult to fathom, as ARI and FRA had discussed conducting the analysis

for months preceding the Directive.  JA1709,JA1733-JA1735,JA1737-JA1738.  It

is the **only** analysis in the record that touches on the central question of whether the weld defects in the subject tank cars would cause them to leak, so as to justify accelerated inspections under 49 C.F.R. § 180.509(b)(4).

An agency's failure to respond to specific challenges that were sufficiently central to the issues constitutes arbitrary and capricious decision making. *See Am. Mining Cong.*, 907 F.2d at 1190-91 (citation omitted). Unlike cases where a regulator is choosing between competing data or expert opinions, FRA ignored the **only** evidence in the record addressing the central issue of whether the defects found would lead to a leak. *See Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 403 (D.C. Cir. 1994) (agency cannot, without a reasoned explanation, rely on its own unsupported assumptions when the record contains contradictory information).[5]

Recognizing the void in the record, FRA now offers several *post hoc* explanations for discounting ARI's analyses. Resp. Br. 35-36. As a threshold matter, these should be disregarded, as "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Burlington Truck Lines, Inc. v.*

---

[5] The cases FRA cites are also distinguishable. *See Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (upholding agency action where agency responded to commenter's challenge to the appropriateness of *any* rate change, but did not describe why the exact dollar figure of the rate was chosen); *Reytblatt v. NRC*, 105 F.3d 715, 722 (D.C. Cir. 1997) (agency's failure to directly respond to one comment letter that contained only "general (and highly abusive) terms" was not arbitrary and capricious).

*United States*, 371 U.S. 156, 168-69 (1962). *See also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 842 F.3d 1271, 1274 (D.C. Cir. 2016) ("Counsel's effort in its brief to provide a *post hoc* rationale for the Commission's order… cannot fill the void.").

FRA's newfound justifications for rejecting the record evidence are also unavailing. Resp. Br. 35-36. First, it is untrue that ARI "admitted" that its analysis did not contradict FRA's assessment that defects could lead to cracks, and in turn to leaks. Resp. Br. 35. All ARI said was that an individual using ultrasonic testing may not be able to distinguish a lack of fusion from a crack, JA1815-JA1816, which would be different for other tests or cracks that migrate to the surface. In any case, this does not matter because the damage tolerance analysis established that even if the defects were cracks, they would not grow to develop a leak. Pet. Br. 43-44; JA1715-JA1718,JA1826.

Second, contrary to FRA's claim, Resp. Br. 35, the analysis did not assume defects that were too small or that there was an overly thick weld.[6] ARI conservatively chose the largest defect found in the report of CTCX-736177,

---

[6] FRA's concerns raise a fundamental lack of technical understanding: a damage tolerance analysis starts with the weld thickness and then inserts a flaw of the appropriate size, which has the effect of reducing the thickness during the analysis. JA0112-JA0125,JA1714-JA1715. Because FRA never disclosed this "concern" until it filed its brief, ARI never had opportunity to explain this in the record.

which extended almost the entire thickness of the metal (0.29" through a tank thickness of 0.41", effectively leaving only 0.06" on each side of the defect). JA1823-JA1825.   FRA never suggested this analysis was inadequate in any respect.  Finally, it is not true that ARI failed to provide an alternative explanation for the leak.  Resp. Br. 35-36.[7]  ARI's analysis concluded that a crack at this low-stress weld would not grow over time, and as such the leak must have been from a condition existing at time of manufacture (*i.e.*, a lack of fusion).  Pet. Br. 9, 11, 43; JA1715-JA1718,JA1826.

> **4.  The Record Does Not Support the Need for a Directive as to the Entire Class of Cars**

FRA argues that even if the defects in question were "*de minimis*," they represent impermissible technical violations and insinuates that therefore the Directive's accelerated inspections are appropriate.[8]   Resp. Br. 37-38.   Yet, § 180.509(b)(4), by its terms, can only be invoked to address unsafe conditions (based on an "objectively reasonable and articulable belief" involving "particularized and identifiable facts"), not any technical violation.  *See* Pet. Br. 45.

---

[7]    The burden is on the agency to provide a reasoned explanation for its actions, not the other way around.  *State Farm*, 463 U.S. at 43.

[8]    Contrary to FRA's characterization, Resp. Br. 33-34, ARI is not arguing that FRA must wait for a potentially catastrophic leak to occur before taking action. That there is a 99.99% chance no other car has a crack or leak is relevant as to whether there are particularized facts justifying the unusual testing requirements imposed here under § 180.509(b)(4) for an entire class of tank cars.

*Dunn v. CFTC*, 519 U.S. 465, 470 (1997) (court is bound to text of authority being applied).

### B. The Regulation Permits FRA to Order More Frequent Tests, Not to Alter the Testing Requirements

Even if FRA had a basis to issue the Directive (which it does not), it lacks legal authority to impose new substantive testing standards under § 180.509(b)(4), which only gives FRA the ability to accelerate a testing date. FRA's brief offers a convoluted interpretation of the regulation that is inconsistent with its plain text, its history, and the regulatory scheme. Resp. Br. 4-7.[9]

FRA argues that the word "appropriate" in § 180.509(b)(4) provides authority to impose new testing requirements. Resp. Br. 24-26.[10] But that ignores the plain language of the rest of the regulation, which clearly places on the ***tank car owner*** the responsibility to "***ensure*** an appropriate inspection and test according to the type of defect…." 49 C.F.R. § 180.509(b). Pet. Br. 46-49. The owner is required to conduct an "appropriate" test in four circumstances: where the tank car shows evidence of unsafe conditions, was in an accident and shows damage, bears evidence of damage caused by fire, or if FRA objectively concludes based on particularized facts that the car may be in unsafe operating condition. 49

---

[9] No deference permits agencies to offer interpretations contrary to the plain meaning of a regulation. *See Christensen*, 529 U.S. at 588.

[10] FRA explains it is imposing "a standard designed to ensure" that certain flaws are found. Resp. Br. 38.

C.F.R. § 180.509(b). What is considered "appropriate" for any of these triggering events is decided the same way: one looks at the qualification program that the owner is obligated to follow under § 180.503. This "standard" for the test is established by the owner. Pet. Br. 48-49.

Finally, the history of the regulation undercuts FRA's argument. The word "appropriate" was not added to the regulation until 1996, to clarify that a full inspection and test of a tank car is not needed when there is only cause for concern as to part of the tank car. *See* 61 Fed. Reg. 33,250, 33,253 (June 26, 1996); *id.* at 33,250 (explaining that the amendments were intended to "***clarify and relax*** certain provisions… and impose ***no new regulatory burden***" (emphasis added)). The same rule also amended the quality assurance program regulations to be consistent with "the approach adopted by… FRA [that] ***allows each tank car owner*** the flexibility to develop inspection and test procedures…." 61 Fed. Reg. at 32,252 (emphasis added). Pet. Br. 48-49. This history is at odds with FRA's assertion that it may use this regulation to impose new standards for tests that fundamentally alter the regulatory scheme through its § 180.509(b)(4) authority.[11]

---

[11]   FRA also claims that mandating specific testing procedures and detection standards is part of a "consistent interpretation" from past directives. Resp. Br. 25. In neither of the two prior instances when FRA invoked its § 180.509(b)(4) authority, has FRA imposed new and unprecedented testing requirements. *Cf. Railworthiness Directive for Railroad Tank Cars Equipped with Certain McKenzie Valve & Machining LLC Valves*, 80 Fed. Reg. 14027 (Mar. 18, 2015) (requiring that subject valves be inspected, but not specifying any particular type of

Unable to escape the plain meaning of its own regulations, FRA suggests that it would be "peculiar" to allow tank car owners to design "appropriate" inspections and tests, suggesting that they would be able to choose "whatever inspections and test they wish." Resp. Br. 25. FRA knows this is not what the regulations state. The regulations and the Tank Car Manual contain a framework and guidelines for the owner in its development of a tank car qualification program, and provide for periodic audit and inspection. *See* 49 C.F.R. § 109.3; JA0030-JA0031,JA0036. Pet. Br. 48-49. Nothing in the regulation authorizes FRA to unilaterally change those procedures without rulemaking. Pet. Br. 49.[12]

---

inspection or defect detection rate); *Notice of Inspection Requirement for Richmond-Built Tank Car Tanks Originally Equipped with "Foam-in-Place Insulation,"* 64 Fed. Reg. 18473 (Apr. 14, 1999) (requiring removal of tank jacket and insulation to conduct inspection, which is necessary under the regulations in certain instances, *see* 49 C.F.R. §§ 180.509, 180.513; JA0033). Further, even if FRA did exceed its authority in prior directives, the fact it was not challenged in the past does not justify its future illegal actions, nor do two previous directives constitute longstanding agency interpretation entitled to deference. *Cf. Barnhart v. Walton*, 535 U.S. 212, 220 (2002).

[12]    Indeed, FRA itself acknowledges this joint industry-agency collaboration in the hazardous materials regulations, explaining that the AAR Tank Car Committee (in which FRA participates) "has traditionally been the body with the expertise to develop tank car design, construction, and maintenance standards in this country." *See* 80 Fed. Reg. at 14,028 n.2.

### C. The Directive's Requirements Are Arbitrary and Capricious

#### 1. The Record Contains No Justification to Support FRA Imposing the 90% POD Requirement

FRA does not take issue with Petitioner's explanation of what a POD is, how it is created, that the regulations provide for tank car owners to establish the specifics of a testing methodology (including a POD), or that the POD requirement contained in the Directive makes no sense. Instead, FRA simply makes the general assertion that the concept of a 90% POD is "an established level of inspection reliability," citing a handful of materials, many of which are unrelated to tank cars and none of which establish that the 90% POD "standard" ordered by the Directive (*e.g.*, the defect size, stress and location of weld joint) is anything close to being established or widespread. Resp. Br. 42-44.

**First**, FRA overlooks the common sense principle that a POD percentage is meaningless without information on what is to be detected at that percentage (*i.e.*, the defect size) and why (*i.e.*, its risk). Pet. Br. 5-6, 49-52. By way of example, a person about to cross an intersection should easily be able to observe 90% of the cars coming her way (more likely 100%) and the risk of missing one car is of serious consequence. Ask that person to detect the color of the drivers' eyes, and the probability drops to zero, but not detecting that fact does not add any risk to crossing the street. A 90% POD requirement therefore has no value without a

reference to the size of the thing to be detected 90% of the time (here, the size of a weld defect) or the risk of missing it (here, the engineering analysis and data).[13]

Although there is certainly expertise involved in deciding what size "thing" needs to be detected to assure safety, the fact that the size matters is obvious. Yet, somehow this concept eludes FRA. FRA initially imposed the 90% POD requirement without specifying a flaw size at all. FRA continues to cite authorities (from other industries—airplanes, spacecraft, the military) in support of a "widespread" use of a 90% POD standard, Resp. Br. 42-43,[14] but that assertion is irrelevant as those sources only support that a 90% POD is desirable and reliable,[15] not that it is reliably attainable or necessary at any particular flaw size, including the size FRA picked.

The 90% POD requirement is also arbitrary because it is completely divorced from any documented potential risk that a tank car is unsafe. Pet. Br. 51-52, 55. Nothing in the record supports how or why FRA chose the flaw size in the Directive (3/16") or demonstrates its connection to the flaw that caused the single

---

[13]     FRA also does not address in its brief the other important components of POD that are missing from the Directive. *See* Pet. Br. 51 (referring to false call rate and confidence level).

[14]     Moreover, two of the sources cited are not in the record and therefore are not properly considered before the Court. *See United States Postal Serv.*, 842 F.3d at 1274.

[15]     It hardly takes technical expertise to conclude that the ability to find most of what one is looking for is desirable.

leak.  JA0023,JA0557,JA0567-JA0568,JA0570.  It was chosen based on what FRA thought could be found (without evidence), not what any evidence showed presented a risk.  As noted above, the undisputed analysis demonstrates that the weld defect sizes that FRA chose will not grow to result in a leak.  JA1715-JA1718,JA1826.  *See* Pet. Br. 52-53.

**Second**, the 90% POD requirement is arbitrary because it sets a standard for which all of the record evidence demonstrates the industry cannot meet.  Pet. Br. 53-54.  ***None*** of the several documents cited by FRA to support that a 90% POD standard is "an established level of inspection reliability," Resp. Br. 42-44, indicate that the defect size chosen by FRA is either established or achievable for tank cars.  Pet. Br. 50-51.  In fact, ***all*** of FRA's own studies indicate the opposite.  *See* Pet. Br. 53-54.[16]  The Directive did not address this consistently contrary evidence.  FRA now asserts that it did, but *post hoc* rationalizations are inappropriate, *Burlington Truck Lines*, 371 U.S. at 168-69, and, in any case, neither the Directive nor the brief explained how FRA's 90% POD requirement is feasible notwithstanding the consistent results showing otherwise.

---

[16]     FRA claims in its brief that one of its studies indicated that a 90% POD was achievable given properly trained technicians.  Resp. Br. 42-43.  That report contained two instances where a technician reached a 90% POD with valid results, but it was for defects ***nine and twelve times larger*** than the defect required to be found in the Directive.  JA1630,JA1678.

FRA also referenced a 24-year-old preamble to a proposed rule (that did not propose any POD standard), in which FRA stated that tank car facilities using nondestructive testing "can expect about 90 percent reliability in detecting flaws." 58 Fed. Reg. 48,485, 48,487 (Sept. 16, 1993); Resp. Br. 43. Again, there is no reference to a flaw size. Simply saying that the agency mentioned the general concept of POD 24 years ago does not constitute reasoned explanation as to why a 90% POD for the flaw sizes chosen by FRA is appropriate. Moreover, the only document cited in that preamble relates to aircraft (not tank cars), is *not* in the record, and in fact showed that a 90% POD could *not* be attained with typical inspection techniques applied by the average technician.[17]

**Third**, FRA's selection of this POD requirement was itself not developed using statistically accepted methods in the industry. Specifically, FRA made up a POD that deviates from accepted practice because it drastically reduced the number of samples required (from 160 to 87), eliminated the need to assess any variations (*e.g.*, in test specimens and inspectors), ignored important variables such as flaw length and orientation, and used sample flaws all of the same size (rather than a distribution of different sizes). *See* JA0112-JA0118,JA0973-JA0975,JA1562,JA1565,JA1570. It is thus incorrect for FRA to assert that ARI

---

[17] *See* Lockheed Georgia Co., "Reliability of Nondestructive Inspections" at xi (1978), http://www.dtic.mil/dtic/tr/fulltext/u2/a072097.pdf.

was able to meet a 90% POD (as that concept is defined in the industry or the authorities FRA cites).

As ARI explained to FRA, a POD is of little benefit if it is utilized on its own and not in conjunction with a damage tolerance analysis, which helps accomplish the basic goal of a POD: to determine the largest flaw that can be "missed" during an inspection without causing a tank car failure before the next inspection. Pet. Br. 51-52; JA0112-JA0118,JA0171-JA0172,JA1171,JA1256-JA1261,JA1316-JA1317,JA1606-JA1608,JA1731-JA1732. Thus, it is ordinarily the case that a Level III technician determines what type of test is necessary to achieve this goal for the specific structure, which may include a POD (normally not required for areas not considered to be "critical," like the weld here). JA0036-JA0037. Here, instead, FRA is setting the flaw size by fiat and the only damage tolerance analysis (conducted by ARI) concluded that the defects at issue would not lead to leaks. JA1715-JA1718,JA1826.

## 2. There Is No Record Support for the New Recordkeeping and Reporting Requirements

FRA does not address the Directive's failure to explain why its changes to the recordkeeping and reporting requirements are necessary or that technology is available to create demanded records. Pet. Br. 55-56. Deference to an agency's technical expertise is appropriate for matters that actually implicate something technical, and even then the agency still must supply an explanation. *Huls Am.*

*Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (deference when an agency "is evaluating scientific data within its technical expertise"). *See also Emera Maine*, 2017 WL 1364988, at *10. Here, FRA only offered a mysterious phrase (the requirements would "provide adequate context") and the implied rejoinder "because we said so." Resp. Br. 44-45; JA0019. Such conclusions without explanations connecting them to the facts found are insufficient.

## CONCLUSION

For the reasons expressed in the opening brief and above, ARI respectfully requests that the Court vacate the Directive.

Respectfully submitted,

K&L GATES LLP

May 15, 2017                      /s/ Barry M. Hartman

Barry M. Hartman (Bar No. 291617)
Pamela J. Garvie (Bar No. 957373)
Theodore L. Kornobis (Bar No. 997236)
Sarah M. Beason (Bar No. 1028222)
Curtis S. Kowalk (Bar No. 1024410)
1601 K Street, N.W.
Washington, D.C.  20006-1600
T:  (202) 778-9000
F:  (202) 778-9100
barry.hartman@klgates.com
pamela.garvie@klgates.com
ted.kornobis@klgates.com
sarah.beason@klgates.com
curtis.kowalk@klgates.com


Sandra L. Brown (Bar No. 60106)
Thompson Hine LLP
1919 M Street N.W., Suite 700
Washington, D.C. 20036-3537
T:  (202) 263-4101
F:  (202) 331-8330
sandra.brown@thompsonhine.com

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,416 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 pt. and Times New Roman type style.

/s/ *Barry M. Hartman*
BARRY M. HARTMAN
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006-1600

## CERTIFICATE OF SERVICE

I herby certify that on the 15th day of May 2017, a copy of the Reply Brief of Petitioners was filed electronically using the CM/ECF system, which will provide service on the parties.

/s/ *Barry M. Hartman*
BARRY M. HARTMAN
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006-1600

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

AMERICAN RAILCAR INDUSTRIES, INC., Petitioner,

v.

FEDERAL RAILROAD ADMINISTRATION, *et al.*, Respondents.

On Petition for Review of
Railworthiness Directive No. 2016-01
Issued by the Federal Railroad Administration

## REGULATORY ADDENDUM
## TO PETITIONER'S REPLY BRIEF

Barry M. Hartman
Pamela J. Garvie
Theodore L. Kornobis
Curtis S. Kowalk
K&L Gates LLP
1601 K Street, N.W.
Washington D.C. 20005-1600

Sandra L. Brown
Thompson Hine
1919 M Street NW, Suite 700
Washington DC 20036-3537

*Attorneys for Petitioner American
Railcar Industries, Inc.*

# TABLE OF CONTENTS

49 C.F.R. § 109.3 ........................................................................ADD149

49 C.F.R. § 109.9 ........................................................................ADD149

49 C.F.R. § 109.17 ......................................................................ADD151



include, but are not limited to, a common offeror, package manufacturer, marking, labeling, shipping documentation, hazard communications, *etc.*

*Remove* means to keep a package from entering the stream of transportation in commerce; to take a package out of the stream of transportation in commerce by physically detaining a package that was offered for transportation in commerce; or stopping a package from continuing in transportation in commerce.

*Safe and expeditious* means prudent measures or procedures designed to minimize delay.

## Subpart B—Inspections and Investigations

### § 109.3   Inspections and Investigations.

(a) *General authority.* An Administrator may initiate an inspection or investigation to determine compliance with Federal hazardous material transportation law, or a regulation, order, special permit, or approval prescribed or issued under the Federal hazardous material transportation law, or any court decree or order relating thereto.

(b) *Inspections and investigations.* Inspections and investigations are conducted by designated agents of the Secretary who will, upon request, present their credentials for examination. Such an agent is authorized to:

(1) Administer oaths and receive affirmations in any matter under investigation.

(2) Gather information by any reasonable means, including, but not limited to, gaining access to records and property (including packages), interviewing, photocopying, photographing, and video- and audio-recording in a reasonable manner.

(3) Serve subpoenas for the production of documents or other tangible evidence if, on the basis of information available to the agent, the evidence is relevant to a determination of compliance with the Federal hazardous material transportation law, regulation, order, special permit, or approval prescribed or issued under the Federal hazardous material transportation law, or any court decree or order relating thereto. Service of a subpoena shall be in accordance with the requirements of the agent's operating administration as set forth in 14 CFR 13.3 (Federal Aviation Administration); 49 CFR 209.7 (Federal Railroad Administration), 49 U.S.C. 502(d), 5121(a) (Federal Motor Carrier Safety Administration), and 49 CFR 105.45–105.55 (Pipeline and Hazardous Materials Safety Administration).

### § 109.5   Opening of packages.

(a) *In general.* Except as provided in paragraph (b):

(1) Stop movement of the package in transportation and gather information from any person to learn the nature and contents of the package;

(2) Open any overpack, outer packaging, or other component of the package that is not immediately adjacent to the hazardous materials contained in the package and examine the inner packaging(s) or packaging components.

(b) *Perishable hazardous material.* To ensure the expeditious transportation of a package containing a perishable hazardous material, an agent will utilize appropriate alternatives before exercising an authority under paragraph (a) of this section.

[76 FR 11592, Mar. 2, 2011, as amended at 78 FR 60763, Oct. 2, 2013]

### § 109.7   Removal from transportation.

An agent may remove a package and related packages in a shipment or a freight container from transportation in commerce for up to forty-eight (48) hours when the agent has an objectively reasonable and articulable belief that the packages may pose an imminent hazard. The agent must record this belief in writing as soon as practicable and provide written notification stating the reason for removal to the person in possession.

### § 109.9   Transportation for examination and analysis.

(a) An agent may direct a package to be transported to a facility for examination and analysis when the agent determines that:

(1) Further examination of the package is necessary to evaluate whether the package conforms to subchapter C of this chapter;

ADD149

(2) Conflicting information concerning the package exists; or

(3) Additional investigation is not possible on the immediate premises.

(b) In the event of a determination in accordance with paragraph (a) of this section, an agent may:

(1) Direct the offeror of the package, or other person responsible for the package, to have the package transported to a facility where the material may be examined and analyzed;

(2) Direct the packaging manufacturer or tester of the packaging to have the package transported to a facility where the packaging may be tested in accordance with the HMR; or

(3) Direct the carrier to transport the package to a facility capable of conducting such examination and analysis.

(c) The 48-hour removal period provided in § 109.7 may be extended in writing by the Administrator pending the conclusion of examination and analysis under this section.

### § 109.11 Assistance of properly qualified personnel.

An agent may authorize properly qualified personnel to assist in the activities conducted under this part if the agent is not properly qualified to perform a function that is essential to the agent's exercise of authority under this part or when safety might otherwise be compromised by the agent's performance of such a function.

### § 109.13 Closing packages and safe resumption of transportation.

(a) *No imminent hazard found.* If, after an agent exercises an authority under § 109.5, the agent finds that no imminent hazard exists, and the package otherwise conforms to applicable requirements in subchapter C of this chapter, the agent will:

(1) Assist in preparing the package for safe and prompt transportation, when practicable, by reclosing the package in accordance with the packaging manufacturer's closure instructions or other appropriate closure method;

(2) Mark and certify the reclosed package to indicate that it was opened and reclosed in accordance with this part;

(3) Return the package to the person from whom the agent obtained it, as soon as practicable; and

(4) For a package containing a perishable hazardous material, assist in resuming the safe and expeditious transportation of the package as soon as practicable after determining that the package presents no imminent hazard.

(b) *Imminent hazard found.* If an imminent hazard is found to exist after an agent exercises an authority under § 109.5, the Administrator or his/her designee may issue an out-of-service order prohibiting the movement of the package until the package has been brought into compliance with subchapter C of this chapter. Upon receipt of the out-of-service order, the person in possession of, or responsible for, the package must remove the package from transportation until it is brought into compliance.

(c) *Package does not contain hazardous material.* If, after an agent exercises an authority under § 109.5, the agent finds that a package does not contain a hazardous material, the agent shall securely close the package, mark and certify the reclosed package to indicate that it was opened and reclosed, and return the package to transportation.

(d) *Non-compliant package.* If, after an agent exercises an authority under § 109.5, the agent finds that a package contains hazardous material and does not conform to requirements in subchapter C of this chapter, but does not present an imminent hazard, the agent will return the package to the person in possession of the package at the time the non-compliance is discovered for appropriate corrective action. A non-compliant package may not continue in transportation until all identified non-compliance issues are resolved.

### § 109.15 Termination.

When the facts disclosed by an investigation indicate that further action is not warranted under this part at the time, the Administrator will close the investigation without prejudice to further investigation and notify the person being investigated of the decision.



Nothing herein precludes civil enforcement action at a later time related to the findings of the investigation.

### § 109.16 Notification of enforcement measures.

In addition to complying with the notification requirements in § 109.7 of this part, an agent, after exercising an authority under this subpart, will immediately take reasonable measures to notify the offeror and the person in possession of the package, providing the reason for the action being taken, the results of any preliminary investigation including apparent violations of subchapter C of this chapter, and any further action that may be warranted.

[78 FR 60763, Oct. 2, 2013]

## Subpart C—Emergency Orders

### § 109.17 Emergency Orders.

(a) *Determination of imminent hazard.* When an Administrator determines that a violation of a provision of the Federal hazardous material transportation law, or a regulation or order prescribed under that law, or an unsafe condition or practice, constitutes or is causing an imminent hazard, as defined in § 109.1, the Administrator may issue or impose emergency restrictions, prohibitions, recalls, or out-of-service orders, without advance notice or an opportunity for a hearing. The basis for any action taken under this section shall be set forth in writing which must—

(1) Describe the violation, condition, or practice that constitutes or is causing the imminent hazard;

(2) Set forth the terms and conditions of the emergency order;

(3) Be limited to the extent necessary to abate the imminent hazard; and,

(4) Advise the recipient that, within 20 calendar days of the date the order is issued, recipient may request review; and that any request for a formal hearing in accordance with 5 U.S.C. 554 must set forth the material facts in dispute giving rise to the request for a hearing; and

(5) Set forth the filing and service requirements contained in § 109.19(f), including the address of DOT Docket Operations and of all persons to be served with the petition for review.

(b) *Out-of-service order.* An out-of-service order is issued to prohibit the movement of an aircraft, vessel, motor vehicle, train, railcar, locomotive, transport unit, transport vehicle, or other vehicle, or a freight container, portable tank, or other package until specified conditions of the out-of-service order have been met.

(1) Upon receipt of an out-of-service order, the person in possession of, or responsible for, the package must remove the package from transportation until it is brought into compliance with the out-of-service order.

(2) A package subject to an out-of-service order may be moved from the place where it was found to present an imminent hazard to the nearest location where the package can be brought into compliance, provided that the agent who issued the out-of-service order is notified before the move.

(3) The recipient of the out-of-service order must notify the operating administration that issued the order when the package is brought into compliance.

(4) Upon receipt of an out-of-service order, a recipient may appeal the decision of the agent issuing the order to PHMSA's Chief Safety Officer. A petition for review of an out-of-service order must meet the requirements of § 109.19.

(c) *Recalls.* PHMSA's Associate Administrator, Office of Hazardous Materials Safety, may issue an emergency order mandating the immediate recall of any packaging, packaging component, or container certified, represented, marked, or sold as qualified for use in the transportation of hazardous materials in commerce when the continued use of such item would constitute an imminent hazard. All petitions for review of such an emergency order will be governed by the procedures set forth at § 109.19.

### § 109.19 Petitions for review of emergency orders.

(a) *Petitions for review.* A petition for review must—

(1) Be in writing;

(2) State with particularity each part of the emergency order that is sought